## THE METROPOLITAN LIFE INSURANCE COMPANY vs. AUSTIN B. FULLER AND ANOTHER.

New Haven & Fairfield Cos., Oct. T., 1891. ANDREWS, C. J., CARPENTER, SEYMOUR, TORRANCE and FENN, Js.

A life insurance company, located in the city of New York, had issued a large number of policies under a system known as the "Reserve Dividend Plan," by which the policy-holders, at the end of ten years, were to receive a resulting sum, then to be ascertained. At the end of this period the company of its own accord sent to each policy-holder a circular, in which a certain sum was named as the amount due to the person receiving it, but giving no other information, and many of the policy-holders, supposing the statement correct, signed a blank receipt in full, which was sent with the circular, accepted the money and surrendered their policies. *F*, who held one of these policies for the benefit of his wife, refused with her to accept the amount stated to be due, and they brought suit and recovered a much larger sum. He then informed a number of the policy-holders who had surrendered their policies, and made an arrangement with them severally to assign their claims on the company to his wife, and she to bring a single suit on all the claims, to pay all the expenses, and to have half the net proceeds, with a right, if they thought best, to give up the prosecution of the matter and assign back the claims. Under this arrangement the assignments were made. The insurance company thereupon brought a suit against *F* and his wife for an injunction against the bringing of an action upon the assigned policies. *Held*, in refusing the injunction—

1. That no injury could be done to the plaintiff by the proposed institution of a single suit in its own state, as it was better for it than a multiplicity of separate suits would be.
2. That it was not a sufficient reason for granting the injunction that the defendants were to prosecute the suit at their own expense and have half the amount that should be recovered. No rule of public policy was violated by it.
3. That the assignments were not ineffective as being of a mere right to sue, but carried the right to recover the money due the assignors.
4. That they were not ineffective as conveying a mere nominal title, but that they carried a full beneficial interest.

The reasons which made a law against champerty salutary or necessary in England do not exist here, and the enforcement of the law would not always, and perhaps not generally, promote justice. The question in every such case is, whether the contract is opposed to public policy.

[Argued October 27th—decided December 19th, 1891.]

SUIT for an injunction against the institution and maintenance of an action at law and for other equitable relief; brought to the Superior Court in New Haven County, and reserved, upon facts found, for the advice of this court. The case is fully stated in the opinion.

*J. Halsey* and *H. Stoddard*, with whom was *H. Fiske* of New York, for the plaintiff.

*J. W. Alling*, with whom were *L. A. Fuller* of New York and *E. P. Arvine*, for the defendants.

FENN, J. For a proper understanding of this case a statement will be necessary. The plaintiff, a New York corporation, claims an injunction, restraining each of the defendants from prosecuting in any court in this state or elsewhere any claim growing out of certain alleged assignments to the defendants of claims against the plaintiff; from obtaining other like assignments; from transferring any interest claimed by the defendants by virtue of such assignments; and a judgment that the defendants are not, as to the plaintiff, the lawful assignees of any claim upon the plaintiff by virtue of said pretended assignments. Upon its application a temporary injunction was issued which remains in force. The substance of the material portions of the finding made by the court below which reserved the case, is, that the plaintiff, in the prosecution of its business of life insurance, during the years 1872, 1873 and 1874, entered into separate written contracts, of a similar nature, to insure the lives of certain persons named in the pleadings and of many others. Most of these contracts, or policies of insurance, ran for ten years, but a few were for longer terms. In all cases, however, at the end of ten years there was due and payable to the insured a sum of money under what is called the " Reserve Dividend Plan." At the end of this period of ten years from the date of the respective policies, the plaintiff, of its own accord, sent to each of the policy-holders insured under this form of policies during the years named, circulars,

in which a sum was stated as the amount due to such policy-holder. No information was given to policy-holders as to the amounts due, except by these circulars. Upon receipt of the circulars the policy-holders named in the pleadings, without other knowledge, inquiry or investigation, and upon the supposition and belief that such statements were correct, filled in each case a blank left in the circular for such purpose, with the option to "surrender the policy for its present cash value," as stated in the circular, and signed their respective names thereto, and returned the circular, so signed, to the plaintiff. The plaintiff thereupon sent its checks for such stated sum to the policy-holders, who on receipt thereof delivered up their policies and each signed and delivered to the plaintiff a receipt, previously prepared by the plaintiff, by filling in a blank form used for that purpose, stating the sum received to be "in full payment, settlement and discharge of all claims and dividends, surrender value or otherwise, under and by virtue of policy No. ——." All of said circulars, policies and receipts have ever since been in the possession of the plaintiff, between whom and the policy-holders no further communication ever passed.

The defendant Austin B. Fuller resides in New Haven. He had been the insured, and his wife, the other defendant, the assured, under a similar policy, which had been litigated, resulting in the recovery of a very much larger sum than that stated by the plaintiff in its circular to be due. After the close of this litigation, and in the year 1889, he solicited and obtained assignments from the policy-holders named in the pleadings. He believed their cases to be like his own, and that there was more due under their policies. The assignments, executed by the assignors under seal, stated that such assignors "for one dollar, and other good considerations, * * * do hereby sell, set over, transfer and assign unto Harriet A. Fuller of New Haven, Conn, all the claims, demands and causes of action which we, or either of us, have or may have against the Metropolitan Life Insurance Co. of New York." No money was in fact paid, the real consideration and contract being expressed in a writing signed by said

Austin B. Fuller and delivered to each of the assignors, in which is the following statement:— "Said assignment is made upon the following understanding, namely: Said A. B. Fuller is to employ attorneys and counsel for the purpose of prosecuting said claim in the name of said Fuller, and without any liability on the part of said [assignors] to pay the expense or any part thereof. If no recovery is had, the said [assignors] are not to make any claim against said Fullers or either of them. But if the suit results in a judgment and recovery for the plaintiffs, then said A. B. Fuller will pay to [the assignors] one half of such sum as remains to him after paying lawyers and other expenses. If said Fullers find it advisable to give up the attempt to prosecute the claim, then the right is reserved to re-assign the said claim to the former holder, whereupon their liability under this agreement will cease."

These assignments were made to the defendant Harriet A. Fuller, with her authority and consent, her husband transacting the business. She had no pecuniary interest in any of the assignments, but gave general authority to her husband to do what he pleased in respect thereto, in the hope that he, and through him his brother, who was a lawyer in New York, who had conducted the former litigation, would make some money.

The plaintiff having in the complaint alleged that the policies had become of no binding effect, but had been fully discharged and satisfied, the defendants, to the first defence of general denial, added a second, alleging that the surrender of the policies and the receipts were fraudulently obtained by the plaintiff, and that the assignments to the defendants were made for the purpose of enforcing and collecting the claims of the several assignors against the plaintiff, by suits to be brought in court in the state of New York,—the state in which the plaintiff corporation was organized, and where it is located, and in which such assignments and contracts were lawful. The defendants also filed forty-one counterclaims, each of which is based on one of said assigned claims, and they asked, by way of equitable relief, a cancellation

of the receipts given by their assignors to the plaintiff; an account, and judgment for the amount found due by the account; and $100,000 damages. They also asked the answer to numerous interrogatories, and filed a motion for the production of papers and for disclosure.

Upon motion of the plaintiff, and against the earnest protest of the defendants, the court directed " that the issues made by the first defence be heard and determined before any other issue in said cause is tried." The motions aforesaid for answer, disclosure and production, were denied as not relevant to the issue presented by the first defense, and the case, as presented to us upon reservation, was tried solely upon such issue.

Upon the facts found it is not possible for us to see how, under any view which may be taken, the plaintiff can be held entitled to the equitable relief claimed. Surely we ought not to be asked to assume those allegations of the complaint to be true, which the plaintiff did not prove, and the defendants were not permitted to disprove. If any presumption of full payment would naturally and ordinarily arise from the surrender of policies and the giving of receipts in full, such presumption ought not to be invoked against a party who is forbidden to rebut it, or in favor of one who insists that the assignors' right to sue the plaintiff " is a question wholly irrelevant to our cause." The plaintiff explicitly says this " action is founded upon the theory that the *defendants* had no right to sue the *plaintiff* in respect to the policies of insurance, even if the *assignors* might have had some right in that respect." For manifest reasons especial emphasis ought not to be placed on the word " some," in the foregoing quotation, and the word " full " would have better harmonized with the claim of the entire irrelevancy of the assignors' right. But if we adopt the plaintiff's theory it is fatal to the argument which follows; for upon such theory the remedy at law would be as complete and beneficial as the relief in equity. The plaintiff says in the brief,—" The plaintiff can doubtless defend the suits *seriatim* in all jurisdictions, but every action at law by these assignees involves,

*upon their own theory and principles,* the expensive and troublesome discovery which is sought under the second defense and counter-claim. This consideration, that the claim of the defendants necessarily involves this great trouble and expense, seems to preclude these defendants from insisting that the plaintiff has no standing in a court of equity to invoke its jurisdiction. When, upon the very claim of the defendants, numerous suits are involved, and great and unnecessary expense is inflicted upon the other side, such persons have no standing in a court of equity to object to its jurisdiction." Now as to the foregoing statement, it seems manifest, first, that the object and natural effect of these assignments was not to create but to prevent a multiplicity of suits, *seriatim,* by such assignors in all jurisdictions; that instead, there should be but a single suit by the assignees, in one (and that the plaintiff's home) jurisdiction. Certainly there is nothing to negative such an inference, and the defendants offered, both by special defense and under the general denial, to prove such actual intention, both on the part of the assignors and of the defendants, and were precluded. Waiving then the question whether the defendants' action made the suits more likely to be brought at all, the proposed manner of bringing them would be the opposite of what the plaintiff has claimed. Second; having started to test the plaintiff's theory, it seems best to pursue that rather than at once determine what would follow from that of the defendants. And on the plaintiff's theory certainly there could be no such " expensive and troublesome discovery," since, if the plaintiff's contention is right here, it must be (and can only be so here, because it would be,) right there also. As the assignees would have no right any way, the case would break down at the start, and such discovery would be " wholly irrelevant to the cause." Third; equitable relief, it may be added, is usually granted rather upon the consideration that the plaintiff has a standing to insist, than that the defendant has not one to object. This is so generally the rule that a departure from it in any instance is somewhat calculated to excite suspicion, and in this case

it might lead to one, that the prevailing reason why the plaintiff seeks the equitable interposition of this jurisdiction is that he doubts the validity of his grounds, as legal or equitable defenses in any other. Certainly in the granting of injunctions, which is not a matter of right, but rests in the sound discretion of the court, we ought not in this jurisdiction to enjoin defendants who never intended to institute any proceedings whatever here, from bringing cases in the state wherein the plaintiff is located, which, for aught that appears, would be there legal, and might be prosecuted to a successful issue, and in a manner calculated to cause the least expense and inconvenience to the plaintiff. The plaintiff, however, says (citing *Brewster* v. *Colegrove*, 46 Conn., 105,) that " where the allegations of a bill in equity are sufficient to give a court of equity jurisdiction, and the case goes to a hearing upon its merits, and the facts are found, the jurisdiction is not defeated by the fact that the finding shows that the petitioners had adequate remedy at law." This rule, undoubtedly correct in cases where it has proper application, has none here. Neither the allegations of the complaint, so far forth as upon the plaintiff's claim held relevant to the issue, nor the hearing, which was not a full one and upon the merits but only as to a single issue, nor the nature of the relief sought, would warrant such application.

As these considerations are decisive of the case, we might with propriety, so far as that is concerned, stop here, but as other claims necessary to be established as a basis for the plaintiff's theory, which for the sake of testing that theory we have assumed, were fully argued, and are of interest to the profession, and in order that we may not be misunderstood as assenting to them, we will give them some examination. It was, as we have seen, the plaintiff's contention that, conceding the assignors' right of action against the plaintiff, the defendants had no such right. In support of this view a double claim was made—first, that such right as these assignors had was not assignable, and second, that, if assignable, no valid assignments to the defendants had been made. It is rather hard to treat either of these claims dis-

tinctly, without involving some considerations pertinent to the other. But we will endeavor to do so. As to the assignability; it is said that the transaction between the plaintiff and the owners of the policies operated, *primâ facie*, to end all liability, and that "a receipt in full, in the absence of any impeachment for fraud or mistake, is valid, and the discharge of the entire debt," (*Aborn* v. *Rathbone*, 54 Conn., 444;) that therefore, if any of the assignors had brought suit, either in the complaint or by special answer the necessity of setting aside such receipt and settlement would have been presented at the very outset; so that, as claimed, the only thing which such assignors had was a right to apply for such rescission, and that a mere right to bring a suit at law or in equity is not the subject of bargain and sale or of assignment. Now it seems to us that to this claim there are many decisive answers, one being that, conceding that a receipt in full in the absence of fraud or mistake is valid and a discharge of the entire debt, it is only so upon the assumption of the non-existence of what is here claimed to exist. If, to the claim of a receipt in full it would be necessary for the plaintiff to plead fraud or mistake, or even ask that on such an account the receipt should be surrendered, it does not follow that all which the plaintiff has is a bare right to make such a demand. If he had nothing more he could not have that. As well say that if the statute of limitations had run against the original obligation, but the creditor relied upon a new promise, the debt could not be assigned, because he would have been met in a suit by a plea of such statute, and all that he had was a mere right to remove the discharge by the plea of a new promise. The fraud or mistake which induces the giving of a receipt in full does not discharge a debt; nor does the receipt so obtained, only to be revived again on the removal of such obstruction to recovery. That *dicta* may be found supported by most eminent authority, that " the assignment of a mere right of action to procure a transaction to be set aside on the ground of fraud is not admitted," is certain. The difficulty in construction and application lies in the fact that the phrase is somewhat ambiguous,

and if it remains as true to-day, and in Connecticut, as it was in England in 1835, when *Prosser et al.* v. *Edmonds et al.*, reported in 1 Younge & Collyer, 481, (which is the primal authority for the doctrine,) was decided, it is, as we shall see hereafter, because it rests upon a different reason and receives a far more restricted practical construction. The objection then was that such assignment violated the policy, if not the letter, of the law against champerty and maintenance, as operating merely to promote or procure litigation. The ancient law made the principle subordinate to the instance. The modern is the reverse. Under the former public policy was opposed to champerty and maintenance, and therefore all contracts which savored of these vices were void. Under our present law public policy is the sole consideration, and contracts formerly held void by reason of champerty and maintenance may or may not be contrary to such policy. If, therefore, it be stated that " a mere right of action to procure a transaction to be set aside on the ground of fraud is not permitted here," the expression should be understood to mean that it would be opposed to public policy to permit a person claiming a right to set aside a transaction on the ground of fraud and to be invested with his former beneficial interest,—to separate the former from the latter and to transfer that without the other. It is unnecessary, however, to pursue this further, since, if the rule be correctly stated in the quotation made in the plaintiff's brief from Pollock on Contracts, p. 299, that " the sale of an interest to which a right to sue is incident, is good, but the sale of a mere right to sue is bad," it seems to us manifest that the transaction here is of the former character. The principles upon which choses in action are now held assignable are clearly stated in Pomeroy on Remedies & Remedial Rights, sections 144 to 153 inclusive, and a multitude of cases there cited are confirmatory of our present views.

It is however, as we have seen, further said that, if assignable, no valid assignment to the defendants or either of them was made. It is said that the purported assignments show by their character, as well as by the nature of the interest,

(to which latter we have already referred,) that these trans-
actions are champertous, and that they are opposed to pub-
lic policy.   So far as champerty is concerned, we fully agree
with the opinion expressed by this court in *Richardson* v.
*Rowland*, 40 Conn., 565, that the reasons which made such
a law salutary or necessary in England do not exist here,
and that the enforcement of the law here would not always,
perhaps not generally, promote justice, and we think the
true inquiry may therefore be limited exclusively to the
question whether the contract is opposed to public policy.
Nor can we see that the contracts in question are so opposed.
The court, in *Richardson* v. *Rowland*, quote, with evident
approval, the remark of PARKER, C. J., in giving the opin-
ion of the court in *Thurston* v. *Percival*, 1 Pick., 417:—"It
sometimes may be useful and convenient, when one has a
just demand which he is not able from poverty to enforce,
that a more fortunate friend should assist him, and wait for
his compensation until the suit is determined, and be paid
out of the fruits of it."   It would manifestly be both useful
and convenient to policy-holders of the plaintiff, residing in
this state, who, by the successful results of a litigation
brought by one of their own class, had been led to believe
that far more was justly due to them than had been repre-
sented, and on the strength of which representation they
had surrendered their policies, having thus, as they then be-
lieved, just demands, the individual enforcement of which, to
any person in ordinary circumstances, would be so expensive
and difficult as to amount to a practical impossibility, that a
more fortunate person, of experience, ability and inclination,
should assist them, and wait for his compensation until the
suits were determined, and be paid out of the fruits of them.
And whatever was the motive of the defendants, whether
selfish or philanthropic, inasmuch as we cannot see why the
only avenue practicable to the assignors is one which could
lead to any unjust consequences to the plaintiff, we can dis-
cover no rule of public policy that would be thereby vio-
lated.

It is said further that these assignments did not create the

defendants assignees, and equitable and *bonâ fide* owners of these rights of action, and the following cases in this state are cited. *Fitch* v. *Gates*, 39 Conn., 366 ; *Byxby* v. *Parsons*, 49 id., 483, 487 ; and *Olmstead* v. *Scutt*, 55 id., 125. In each of those cases it was held that the assignee acquired no right of independent action or of set-off. But the principle of such decision is not applicable here. The ground was that the assignee was such for the mere purpose of such action or set-off, having no beneficial interest or title. Here it was the beneficial interest which was expressly stipulated for and which the assignees intended to acquire and the assignors to convey. The form of the transaction was an absolute transfer, under seal, to Mrs. Fuller, and although the real consideration and purpose appeared in the paper executed by her husband, Austin B. Fuller, which contained, among other things, the reservation of a right to re-assign in discharge of liability, yet that real purpose as there expressed was a judgment and recovery *for the assignees.*

The defendants insist that, having by the action of the plaintiff been brought into court, they are entitled to judgment in their favor upon the first defense, and also to the same right to " prosecute their counter-claim as they would have had if the whole case had been on trial in the Superior Court." In this view we do not, however, concur.

The Superior Court is advised to dissolve the injunction and dismiss the complaint.


In this opinion the other judges concurred.