## LYDALL, INC. *v.* WALTER A. RUSCHMEYER
## (SC 17612)

Borden, Norcott, Katz, Palmer and Vertefeuille, Js.

Argued May 18, 2006—officially released April 24, 2007

*Jennifer B. Rubin*, with whom were *Sarah B. Herlihy* and, on the brief, *Andrew N. Nathanson*, for the appellant (defendant).

*David J. Elliott*, with whom was *Jonathan B. Tropp*, for the appellee (plaintiff).

PALMER, J. The defendant, Walter A. Ruschmeyer, appeals[1] from the judgment of the trial court, following a bench trial, enjoining him from disclosing or using information deemed by the trial court to be a trade secret and awarding compensatory and punitive damages and attorney's fees to the plaintiff, Lydall, Inc. (Lydall). The trial court concluded that Ruschmeyer had breached employment agreements with Lydall and had violated the Connecticut Uniform Trade Secrets Act (CUTSA), General Statutes § 35-50 et seq., and the Connecticut Unfair Trade Practices Act (CUTPA), General Statutes § 42-110a et seq. Ruschmeyer raises numerous claims on appeal. We conclude that the trial court (1) properly found that a specific item of information that Ruschmeyer had disclosed was a trade secret, (2) correctly determined that Ruschmeyer had violated CUTSA by disclosing that information but improperly determined that Ruschmeyer's conduct in planning to purchase and restructure Lydall on the basis of his knowledge of Lydall's business violated CUTSA, (3) correctly determined that Ruschmeyer had threatened to disclose additional components of Lydall's strategic business plan that might constitute trade secrets but improperly enjoined Ruschmeyer from disclosing all individual components of Lydall's strategic business plan, (4) correctly determined that Ruschmeyer had breached his employment contracts, (5) improperly determined that Ruschmeyer wilfully and maliciously had violated CUTSA and improperly awarded punitive damages and attorney's fees to Lydall, (6) improperly determined that Ruschmeyer had violated CUTPA, (7) improperly awarded compensatory damages to Lydall in light of the fact that Lydall had failed to assert a

[1] The defendant appealed to the Appellate Court from the judgment of the trial court, and we transferred the appeal to this court pursuant to General Statutes § 51-199 (c) and Practice Book § 65-1.

claim for damages at trial, and (8) improperly enjoined Ruschmeyer from bringing an indemnification action against Lydall in the state of Delaware. Accordingly, we reverse in part the judgment of the trial court.

The record reveals the following relevant facts and procedural history. Lydall is a diversified, publicly traded corporation engaged in the business of designing and manufacturing specialty engineered air and liquid filtration media, automotive thermal and acoustical barriers, industrial thermal and insulating products and medical filtration and biopharmaceutical processing components. It is comprised of three main divisions,[2] each of which, in turn, is divided into numerous business units. Those units produce hundreds of different products.

Ruschmeyer is Lydall's former executive vice president of finance and administration and chief financial officer. In connection with his employment with Lydall, Ruschmeyer executed two employment agreements. The first employment agreement contained the following language: "I will not, directly or indirectly, during or at any time after the period of my employment by Lydall, use for myself or others, or disclose to others, any confidential information, no matter how such information becomes known to me, unless I first obtain Lydall's written consent."[3] The second agreement pro-

---

[2] Lydall's Form 10-K for the year ending December 31, 2002, which had been filed with the federal Securities and Exchange Commission, describes these divisions as "Thermal/Acoustical," "Filtration/Separation" and "Other Products and Services."

[3] The first employment agreement defined "[c]onfidential [i]nformation" to include "all business information and records which relate to Lydall and which are not known to the public generally, including, but not limited to, technical notebook records, technical reports, patent applications, machine equipment, computer software, models, process and product designs, including any drawings and descriptions, unwritten knowledge and 'know-how', operating instructions, training manuals, productions and development processes, production or other schedules, customer lists, customer buying records, product sales records, sales requests, territory listings, market surveys, plans including marketing plans, long-range plans, salary informa-

vided in relevant part that Ruschmeyer would "devote his full business time and attention and best efforts to the affairs of [Lydall] and its subsidiaries and his duties as Executive Vice President-Finance and Administration, Chief Financial Officer . . . ." It further provided that Ruschmeyer "expressly agrees that [Lydall] shall be entitled to injunctive and other equitable relief without bond or other security in the event of such breach in addition to any other rights or remedies which [Lydall] may possess or be entitled to pursue."

In May, 2002, all of Lydall's business units began preparing strategies and plans for future business development. After developing preliminary plans, representatives of those business units met with Ruschmeyer and Christopher Skomorowski, Lydall's chief executive officer, to review the plans. Each business unit then generated a set of "action plans" that, together with a financial analysis, was submitted to Ruschmeyer, Skomorowski and Hui Jing Shi, Lydall's director of financial analysis and planning. On the basis of these materials, Ruschmeyer and his department prepared for presentation to Lydall's board of directors five year strategic plans for each business unit and for the company as a whole.[4]

In January, 2003, Lydall's board of directors asked its chairman, Roger Widmann, to review Ruschmeyer's job performance. In carrying out this assignment, Widmann spoke to those employees of Lydall who reported directly to Ruschmeyer. They all told Widmann that Ruschmeyer had treated them with disrespect and had destroyed the collegiality that previously had existed within the company. Widmann then met with Ruschmeyer, reported these statements and told Ruschmeyer that he had ninety days to address the various issues

tion, contracts, supplier lists, product costs, policy statements, policy procedures, policy manuals, flowcharts, computer printouts, program listings, reproductions and correspondence."

[1] We refer to these plans collectively as the strategic plan.

that the employees had raised and to correct the problems.

On March 20, 2003, Ruschmeyer met with Stephen Curley, an attorney with the law firm of Mintz, Levin, Cohn, Ferris, Glovsky and Popeo, P.C., and a specialist in mergers and acquisitions, and with investment bankers Robert Arnold and Felicia Rosenzweig. One purpose of the meeting was to discuss whether Lydall would be a "viable candidate for [a management buyout]." The meeting took place without Lydall's knowledge at the home of Ruschmeyer's mother. Over the next several weeks, Ruschmeyer sent several e-mails to Curley attaching various versions of a document entitled "talking points," in which he set forth his ideas for purchasing and restructuring Lydall.

In late March or early April, 2003, Widmann again spoke with the employees who reported to Ruschmeyer. They told Widmann that Ruschmeyer had not mended his ways and that he had become very withdrawn, spending hours in his office with the door closed. Widmann decided at that time to terminate Ruschmeyer's employment with Lydall but did not inform Ruschmeyer of his decision.

On April 8, 2003, Ruschmeyer went to the office of Mary Tremblay, Lydall's general counsel. He was angry and told Tremblay that, if the company made him angry enough, he would take it over. Ruschmeyer also told Tremblay that several members of Lydall's board of directors wanted to terminate her employment and identified the members by name. Thereafter, Skomorowski and a member of the board of directors learned of Ruschmeyer's statements to Tremblay. On April 16, 2003, Lydall terminated Ruschmeyer for cause.

The next day, Ruschmeyer sent to Curley an updated version of his talking points document. On April 30, 2003, Rosenzweig sent Ruschmeyer an e-mail attaching

a document entitled "Hoover,"[5] which set forth several questions and observations about Lydall's business and suggested potential strategies for acquiring Lydall. On July 1, 2003, Curley sent a letter to Steven Segal, an investor with the firm of J.W. Childs Associates, L.P., in Boston, Massachusetts. Attached to the letter was an "executive summary" setting forth a strategy for acquiring and restructuring Lydall.[6] The letter provided that "[t]he Hoover strategy is simple, but requires an insider's knowledge and perspective to be effective. We are eager to have you meet [Ruschmeyer] and hear his detailed description of [Lydall] and his strategy to maximize its hidden value." Lydall learned of the Hoover plan when a copy of Curley's letter to Segal mistakenly was sent to its offices in July, 2003.

Thereafter, Lydall brought this action against Ruschmeyer, alleging, in three counts, breach of contract and violations of CUTSA and CUTPA, and seeking, inter alia, an order permanently enjoining Ruschmeyer from using or disclosing any of Lydall's confidential business information, as well as compensatory damages, punitive damages and attorney's fees. After a bench trial, the trial court found for Lydall on all counts and ordered that Ruschmeyer be "permanently enjoined from the use and disclosure of Lydall's trade secrets for a period of three years," and that he be "permanently enjoined from using and disclosing any confidential information as described in his [employment agreements]" for the same period. In its memorandum of decision, the court indicated that it would subsequently hold a hearing on the issues of compensatory damages, punitive damages and attorney's fees. Thereafter, Lydall filed a memorandum in support of its claim for damages in which it

---

[5] Ruschmeyer, Curley and Rosenzweig apparently used the term "Hoover" as a code word for Lydall.

[6] For convenience, we refer to Ruschmeyer's plan to purchase and restructure Lydall as the Hoover plan.

requested further injunctive relief in the form of an order enjoining Ruschmeyer from seeking indemnification for his attorney's fees in legal proceedings in Delaware pursuant to an indemnification provision contained in the second employment agreement. Over Ruschmeyer's objection, the court held a hearing in damages and, following that hearing, awarded Lydall $47,082 in compensatory damages, $94,164 in punitive damages and $551,366 in attorney's fees pursuant to General Statutes §§ 35-53 (b)[7] and 42-110g (a).[8] Thereafter, the court held a hearing on Lydall's request for further injunctive relief and issued an order barring Ruschmeyer from filing an action for indemnification against Lydall in Delaware. This appeal followed.[9] Additional facts and procedural history will be set forth as necessary.

[7] General Statutes § 35-53 provides: "(a) In addition to or in lieu of injunctive relief, a complainant may recover damages for the actual loss caused by misappropriation. A complainant also may recover for the unjust enrichment caused by misappropriation that is not taken into account in computing damages for actual loss.

"(b) In any action brought pursuant to subsection (a) of this section, if the court finds wilful and malicious misappropriation, the court may award punitive damages in an amount not exceeding twice any award made under subsection (a) and may award reasonable attorney's fees to the prevailing party."

[8] General Statutes § 42-110g (a) provides: "Any person who suffers any ascertainable loss of money or property, real or personal, as a result of the use or employment of a method, act or practice prohibited by section 42-110b, may bring an action in the judicial district in which the plaintiff or defendant resides or has his principal place of business or is doing business, to recover actual damages. Proof of public interest or public injury shall not be required in any action brought under this section. The court may, in its discretion, award punitive damages and may provide such equitable relief as it deems necessary or proper."

General Statutes § 42-110b provides in relevant part: "(a) No person shall engage in unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce. . . ."

[9] Ruschmeyer filed his initial appeal from the trial court's order granting injunctive relief and thereafter filed an amended appeal from the trial court's subsequent orders awarding damages to Lydall and enjoining Ruschmeyer from seeking indemnification from Lydall for his attorney's fees.

On appeal, Ruschmeyer claims that the trial court improperly (1) determined that certain items of information disclosed by Ruschmeyer, and the strategic plan as a whole, were trade secrets, (2) determined that Ruschmeyer had misappropriated, and had threatened to misappropriate, trade secrets within the meaning of CUTSA, and enjoined him from disclosing any portion of the strategic plan,[10] (3) determined that Ruschmeyer had breached his employment agreements with Lydall and enjoined Ruschmeyer, under those agreements, from using or disclosing Lydall's confidential business information, (4) determined that Ruschmeyer wilfully and maliciously had violated CUTSA and, therefore, that Lydall was entitled to punitive damages, (5) determined that Ruschmeyer had violated CUTPA, (6) held a post-trial hearing on damages and awarded compensatory damages to Lydall even though Lydall had failed to assert any claim for damages at trial, and (7) enjoined Ruschmeyer from bringing an indemnification action in Delaware even though the indemnification issue had not been litigated. We address each claim in turn.

I

We first address Ruschmeyer's claim that the trial court improperly concluded that certain items of information that he had disclosed and used in developing the Hoover plan constituted trade secrets within the meaning of CUTSA. Specifically, Ruschmeyer claims that the trial court improperly found that (1) certain profit margin information that he had disclosed consti-

---

[10] Lydall maintains that Ruschmeyer "has not raised in his appeal brief any challenge to the language of the injunction issued by the trial court" or, if he has, the issue is inadequately briefed. Lydall further contends that Ruschmeyer therefore has waived any claim regarding the scope of the injunction. We disagree. Ruschmeyer's claim on appeal is that there was *no basis* for the injunction because the trial court improperly had found that all of the components of the strategic plan were trade secrets and that Ruschmeyer had intended to disclose those components.

tuted trade secrets, (2) certain elements of the strategic plan that he had disclosed constituted trade secrets, and (3) the strategic plan as a whole was a trade secret. Lydall does not dispute Ruschmeyer's claim that the individual items of information contained in various correspondence among Ruschmeyer, Curley, Rosenzweig and Segal concerning the Hoover plan did not constitute trade secrets. Instead, Lydall contends that it was not required to prove that each "[j]ot and tittle" disclosed by Ruschmeyer was a trade secret in and of itself but only that its strategic plan, taken as a whole, was confidential and that, consequently, each of its individual components was a trade secret.

For the reasons set forth in part II B 2 of this opinion, however, we conclude, contrary to Lydall's claim, that all the individual components of a secret business plan are not *necessarily* trade secrets. Nevertheless, we must review the trial court's findings as to each individual item of information because, as we explain hereinafter, each such finding *could* support the court's determination that Ruschmeyer unlawfully had used or disclosed trade secrets. We conclude that the trial court properly found that information concerning Lydall's plans for a line of surgical products known as "OEM" products was a trade secret.[11] We further conclude that the court incorrectly determined that the other specific items of information that Ruschmeyer had disclosed were trade secrets. With respect to the strategic plan as a whole, we need not determine whether it was a trade secret because the evidence does not establish that Ruschmeyer used or disclosed it within the meaning of CUTSA.

As a preliminary matter, we set forth the standard of review. "The question of whether information sought

---

[11] "OEM" refers to a line of products designed for use in open chest surgeries.

to be protected by [CUTSA] rises to the level of a trade secret is one of fact for the trial court. . . . [When] the factual basis of the court's decision is challenged we must determine whether the facts set out in the memorandum of decision are supported by the evidence or whether, in light of the evidence and the pleadings in the whole record, those facts are clearly erroneous. . . . In other words, to the extent that the trial court has made findings of fact, our review is limited to deciding whether those findings were clearly erroneous." (Citations omitted; internal quotation marks omitted.) *Elm City Cheese Co.* v. *Federico*, 251 Conn. 59, 68, 752 A.2d 1037 (1999). "A finding of fact is clearly erroneous when there is no evidence in the record to support it . . . or when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed. . . . In making this determination, every reasonable presumption must be given in favor of the trial court's ruling." (Internal quotation marks omitted.) *Gordon* v. *Tobias*, 262 Conn. 844, 849, 817 A.2d 683 (2003).

With respect to what constitutes a trade secret, the meaning of that term is set forth at General Statutes § 35-51 (d). Under that statutory subsection, "trade secret" is defined as "information, including a formula, pattern, compilation, program, device, method, technique, process, drawing, cost data or customer list that: (1) Derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use, and (2) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy." General Statutes § 35-51 (d). We now turn to the merits of Ruschmeyer's claims.

## A

We first address Ruschmeyer's claim that the trial court improperly determined that certain items of profit margin information that he had disclosed to Curley constituted trade secrets. The following additional facts and procedural history are relevant to this claim. On March 30, 2003, Ruschmeyer sent a talking points document via e-mail to Curley in which he stated that "[m]argins vary widely among [Lydall's various] businesses . . . ." In a version of the talking points document that Ruschmeyer sent to Curley on April 8, 2003, Ruschmeyer stated that, "[w]ithin the norms of the automotive industry, [Lydall's] business has healthy margins and cash flows." The Hoover document that Rosenzweig sent to Ruschmeyer on April 30, 2003, stated that "[s]ome Filtration/Separation products are extremely high-margin but short-term contributors, due to evolution in technology . . . ."

The trial court concluded that this profit margin information met "the test of independent economic value, actual or potential, not generally known and not readily ascertainable by proper means potentially being revealed to other persons . . . who can obtain economic value from its disclosure or use" and, therefore, constituted a trade secret. With respect to the April 8, 2003, talking points document, the court found that, "[a]lthough there has been public disclosure of the entire company's gross margins, the margins of the individual segments, including automotive, were not made public. Ruschmeyer not only disclosed this information to a third party, namely, Curley, but clearly *used* the information on the margins of the automotive segment to prepare his talking points." (Emphasis in original.) The trial court further observed that "Ruschmeyer would have to have known the inner workings including profit margins of automotive and trucking, i.e., trade secrets, in order to formulate the Hoover plan, which

calls for a sell off of these two segments." With respect to Rosenzweig's Hoover document, the trial court concluded that she could have obtained the information about the filtration and separation products only from Ruschmeyer and that "[t]his information was not public and was disclosed to an outsider and used by Ruschmeyer to inform someone with whom he was working to develop the Hoover plan."

After this appeal was filed, Ruschmeyer filed a motion for articulation in which he requested, inter alia, that the trial court articulate the basis for its conclusion that Ruschmeyer had "disclosed confidential, nonpublic information about specific segment margins" for Lydall. He also requested that the court identify the evidentiary basis for its conclusions that the profit margins were not public information and that they had economic value. In its articulation, the trial court stated that the evidence adduced at trial established that Ruschmeyer had "revealed that the automotive profit margin is well in excess of 30 percent." The court also observed that, as it had explained in its original memorandum of decision, information regarding profit margins is valuable economic information because customers can use it to seek price cuts.

Ruschmeyer first claims that his statement in the April 8, 2003 talking points document, which he sent to Curley, that "[w]ithin the norms of the automotive industry [Lydall's] business has healthy margins and cash flows," was not a trade secret. He also contends that the trial court's finding that he had revealed that the profit margin for the automotive segment was "well in excess of 30 percent," was unsupported by the evidence. He further maintains that the information that Lydall's automotive profit margin was above average could not be a trade secret because Lydall publicly had disclosed that fact.

We agree with Ruschmeyer that there is nothing in the record to support the trial court's finding that Ruschmeyer had disclosed the specific profit margin for Lydall's automotive business. In fact, the evidence indicated that the company as a whole had a target profit margin of 30 percent, and that that information was not confidential. Although the evidence indicated that the profit margin actually derived from each individual component of the business was confidential, there was no evidence establishing that Ruschmeyer had disclosed the specific profit margin for Lydall's automotive business. Moreover, Skomorowski testified that the fact that the profit margin for Lydall's automobile business was above average was not confidential, and Widmann testified that Lydall publicly had disclosed that fact to potential investors. Indeed, Lydall points to no testimony indicating that this information was unavailable publicly. Accordingly, the trial court incorrectly determined that this item of information constituted a trade secret as defined by § 35-51 (d).

Ruschmeyer also maintains that the fact that "[m]argins vary widely among [Lydall's various] businesses" was not a trade secret because the operating margins for each of Lydall's business segments were regularly disclosed in its Form 10-K, which is filed annually with the federal Securities and Exchange Commission. That form disclosed both operating income and net sales for each of Lydall's three main divisions.[12] Ruschmeyer further contends that the information was so general that it would provide no competitive advantage to Lydall's customers and would have no economic value to persons interested in acquiring the business, and that

---

[12] Lydall's Form 10-K indicated that, in 2002, its thermal/acoustical division had an operating margin of approximately 14 percent, its filtration/separation division had an operating margin of approximately 15 percent, and its other products and services division had an operating margin of approximately 7 percent.

Skomorowski conceded as much in his trial testimony. Again, Lydall points to no evidence that would support a finding that this information was secret or that it had economic value, and our review of the record does not disclose any such evidence. Accordingly, the trial court's finding that this item of information constituted a trade secret under § 35-51 (d) was clearly erroneous.

Finally, Ruschmeyer claims that the information contained in Rosenzweig's Hoover document, that "[s]ome Filtration/Separation products are extremely high-margin but short-term contributors, due to evolution in technology," was not a trade secret. He acknowledges that Lydall's profit margins for specific products were confidential and had economic value but asserts that the trial court merely "speculated that . . . Ruschmeyer must have disclosed this information to . . . Rosenzweig in the first place," and further asserts that he was not aware of the profit margins for any of the hundreds of products manufactured by Lydall. Ruschmeyer further maintains that, because the statement did not identify specific products, it provided no economic advantage to customers or economic value to potential competitors.

We do not agree that the trial court's conclusion that Rosenzweig's profit margin information that came from Ruschmeyer necessarily was the product of speculation. Ruschmeyer concedes that information about profit margins on Lydall's individual products is not public information, and the record amply supports the conclusion both that Ruschmeyer was in frequent contact with Rosenzweig and Curley during the development of the Hoover plan and that Ruschmeyer was a primary source of information about Lydall during that time. We also reject Ruschmeyer's claim that the evidence necessarily demonstrated that he was not aware of the profit margins for Lydall's products. Indeed, Ruschmeyer acknowledged that he had received infor-

mation about Lydall's "gross margins . . . on its various products" at the end of 2002.

As with the other items of profit margin information, however, Lydall has not identified any testimony or other evidence that would support a finding that the general statement that "[s]ome Filtration/Separation products are extremely high-margin" would have economic value to Lydall's customers or competitors. Indeed, Skomorowski conceded that, without knowledge of which specific products were high-margin, the information would have no value. There is nothing in the record to establish that Ruschmeyer actually disclosed which specific products were profitable. In the absence of evidence supporting the trial court's finding that this information constituted a trade secret as defined by § 35-51 (d), the finding is clearly erroneous.

### B

We next address Ruschmeyer's claim that the trial court incorrectly found that certain elements of Lydall's strategic plan were trade secrets. We disagree with Ruschmeyer's claim insofar as it relates to the court's finding concerning Lydall's OEM product line.

The following additional facts and procedural history are relevant to this claim. With respect to Lydall's strategic plan for its blood-related products, Lydall intended to "[s]eek out existing product to add to [its product] line" and "[d]evelop product opportunities . . . ." With respect to Lydall's OEM line of surgical products, the strategic plan called for Lydall to "[m]aximize cash generation . . . ." With respect to Lydall's filtration/separation division, the plan contemplated the "[e]stablishment of [an] Asian Business Center" in 2003.

In Ruschmeyer's April 8, 2003 talking points document, he stated that the new owners of the company should "[u]se OEM (open chest surgery products) for

cash in a slowly declining market." He further proposed that the new owners "[g]row blood products by investing in sales and distribution and acquiring bolt on businesses or product lines that complement the existing business and leverage our distribution sales and distribution network." Finally, he proposed that the new owners "[e]nter Asian markets with all of these products on coattails of Filtration . . . ." The trial court concluded that these items of information were elements of Lydall's strategic plan and constituted trade secrets.

Ruschmeyer maintains that the information pertaining to the OEM products was not a trade secret because the declining rate of open chest surgeries was within the realm of general public knowledge, and, moreover, Lydall had represented to at least one customer that it would not redesign a particular product for the small amount of business involved.[13] Ruschmeyer also claims that, under these circumstances, "anybody with a minimum of business sense" would know that the OEM product line should be used to generate cash.

We are not persuaded. First, Lydall presented evidence establishing that at least one other manufacturer of OEM products was continuing to invest in the development of such products and, as a result, had taken some of Lydall's business. That competitor's business strategy could have been to increase its market share as the overall market declined. Thus, contrary to Ruschmeyer's claim, Lydall's plan to use the product to generate cash while the market for the product declined was not the *only* sensible approach to this line of business. Accordingly, the trial court reasonably could have con-

---

[13] Skomorowski testified that a customer had asked Lydall to redesign an OEM product and that Lydall chose not to do so "for that small amount of business . . . ."

cluded that Lydall's strategy to use its OEM products to generate capital was based on its analysis of the needs of its particular business as a whole.

Second, Ruschmeyer concedes that Lydall is comprised of numerous business entities, which, together, manufacture hundreds of products. The fact that Lydall disclosed to one customer of one of those products that it would not invest in the redesign of the product *for that customer* does not necessarily mean that Lydall's strategic decision that it would no longer invest in the product *at all* was readily ascertainable by persons with no inside knowledge of the business. Indeed, Ruschmeyer has provided no authority for the proposition that any item of information that a company discloses to anyone with whom it does business thereby becomes public information by virtue of that disclosure. In addition, Ruschmeyer does not claim that this item of information had no economic value. For example, the information that Lydall had decided not to invest in the further development of its OEM products could have economic value to a competitor because the competitor could use that information as a tool to solicit Lydall's customers. Accordingly, the trial court's determination that this item of information constituted a trade secret under § 35-51 (d) was not clearly erroneous.

Ruschmeyer also claims that the trial court incorrectly determined that his statement that the new owners should invest in sales and distribution of blood products and acquire "bolt on businesses or product lines that complement the existing business" constituted a trade secret. Ruschmeyer asserts that it was public knowledge that Lydall planned to expand this area of business because Lydall recently had launched three new blood products. In addition, Lydall had disclosed to potential investors that it expected its blood business to grow and that the addition of new products was driving that growth. Finally, Lydall had disclosed

to potential investors that it planned to continue to add "bolt on" product lines to its blood business. Because this information was readily available to members of the general public, we conclude that the trial court's finding that it constituted a trade secret was clearly erroneous.

Ruschmeyer next challenges the propriety of the trial court's finding that he had revealed a trade secret when he proposed that the prospective new owners of the company "[e]nter Asian markets" for OEM products. He asserts that the strategic plan called for the establishment of a new sales and marketing *office* in Asia, through which several of Lydall's products would be sold, whereas his plan called for the sale of a specific line of products, namely, Lydall's vital fluid products, in Asia. He further argues that it was public knowledge that Lydall had offices and did business in Asia. The record is devoid of evidence to support a finding that Lydall had preexisting confidential plans to "[e]nter Asian markets" for OEM products. Accordingly, the trial court's finding that Ruschmeyer disclosed a trade secret as defined by § 35-51 (d) by proposing to do so was clearly erroneous.

## C

Ruschmeyer also claims that the trial court improperly determined that the strategic plan as a whole was a trade secret. We need not reach this issue because we conclude in part II B 1 of this opinion that, even if the strategic plan as a whole was a trade secret, there was no proof that Ruschmeyer used or disclosed the plan within the meaning of CUTSA.

## II

Having reviewed the trial court's findings that the individual items of information that Ruschmeyer had disclosed constituted trade secrets, we next consider

Ruschmeyer's claim that, even if those findings were correct, he did not misappropriate the secrets within the meaning of § 35-51 (b). General Statutes § 35-51 (b) provides in relevant part: " 'Misappropriation' means . . . (2) disclosure or use of a trade secret of another without express or implied consent by a person who . . . (B) at the time of disclosure or use, knew or had reason to know that his knowledge of the trade secret was . . . (iii) derived from or through a person who owed a duty to the person seeking relief to maintain its secrecy or limit its use . . . ."

## A

We already have concluded that Lydall's plan to use OEM products to generate cash in a declining market for such products constituted a trade secret. Moreover, the evidence indicated that Ruschmeyer had disclosed that information to Curley in the April 8, 2003 talking points document. In light of this evidence, the trial court reasonably found that Ruschmeyer's disclosure of this information violated CUTSA.

## B

With respect to Lydall's strategic plan, we conclude that the record does not support a finding that Ruschmeyer used or disclosed the plan as a whole. We further conclude that, although the record supports the trial court's finding that Ruschmeyer intended to disclose additional components of the strategic plan and would have done so if not for Lydall's inadvertent discovery of the Hoover plan, the record does not support the conclusion that the disclosure of those components necessarily would have constituted disclosure of the plan as a whole. Therefore, the finding that Ruschmeyer intended to disclose additional components of the strategic plan does not justify the broad scope of the trial court's injunction, which prohibited Ruschmeyer from

disclosing any component of the strategic plan, regardless of whether it already was public information.

## 1

The trial court found that Ruschmeyer had "disclosed and/or used sufficient elements of Lydall's [strategic] plan so as to have disclosed and used the [strategic] plan as a whole." In support of this finding, the court noted that Ruschmeyer had disclosed profit margin information for Lydall's automotive business and that the disclosure was potentially harmful because it could have been used by competitors or customers as leverage to induce Lydall to reduce its prices.[14] The court also found that this information was essential for the Hoover plan to be successful. We previously have determined that the profit margin information was not a trade secret. Even if it were, however, and even if it were essential to the success of Ruschmeyer's buyout plan, the court did not explain, and we are unable to discern, how the disclosure of a single item of information relating to a specific business unit could amount to disclosure of the strategic plan as a whole. Accordingly, we conclude that the trial court's determination that Ruschmeyer's disclosures of the profit margin information amounted to a disclosure of the strategic plan as a whole was clearly erroneous.

Lydall claims, nevertheless, that the trial court's finding that Ruschmeyer unlawfully had used the strategic plan may be sustained on the alternate ground that Ruschmeyer's "analysis (and indeed his Hoover plan) was informed by his use and understanding" of the strategic plan. Lydall asserts that "even an informed outsider would know neither which particular pieces

---

[14] Although the trial court found that Ruschmeyer had disclosed other specific trade secrets, the court did not discuss those purported trade secrets in connection with its analysis of the issue of whether Ruschmeyer had disclosed the strategic plan as a whole.

of data are the key ingredients [to Lydall's business] nor how to mix those pieces of data into a coherent whole, as Ruschmeyer does." Much of the information that Ruschmeyer had disclosed to Curley and Segal, however, previously had been disclosed by Lydall to potential investors to persuade them that its business was a good investment. Although the information was not compiled in a single, publicly available document, Lydall presumably intended that potential investors would compile whatever information about Lydall that had been made available to the public in making their investment decisions. We therefore reject Lydall's claim that Ruschmeyer was barred, under CUTSA, from disclosing to a potential purchaser the very same items of information that Lydall previously had disclosed for a virtually identical purpose. Cf. *Motor City Bagels, LLC* v. *American Bagel Co.*, 50 F. Sup. 2d 460, 478–79 (D. Md. 1999) (business plan containing information readily ascertainable by public nevertheless may constitute trade secret if compiling information in single place "would be an onerous task"); *Monovis, Inc.* v. *Aquino*, 905 F. Sup. 1205, 1228 (W.D.N.Y. 1994) (trade secret may be comprised of public information if that information makes it possible "to select particular items from a vast sea of public information"). Further disclosure of that information could not destroy its value to Lydall. See, e.g., *Selection Research, Inc.* v. *Murman*, 230 Neb. 786, 796, 433 N.W.2d 526 (1989) (nature of trade secret is that disclosure destroys its value).

To the extent that Lydall maintains that Ruschmeyer's discussions with a potential buyer constituted a prohibited use of a trade secret under CUTSA merely because of Ruschmeyer's familiarity with the strategic plan, we reject that contention. We do not doubt that Segal was willing to discuss a possible purchase of Lydall with Ruschmeyer only because he believed that Ruschmeyer had an insider's knowledge of Lydall's business that

could be used to realize Lydall's "hidden value." Thus, the negotiations arguably were informed by the fact that Ruschmeyer had knowledge of Lydall's strategic plan. Lydall, however, has provided us with no authority to support its claim that the fact that conduct was informed by knowledge of a trade secret can give rise to a violation of CUTSA even though the trade secret itself was neither used nor disclosed.[15]

Although Ruschmeyer also has not cited any authority squarely supporting his claim that this specific type of noncompetitive use of a trade secret is not prohibited under CUTSA, we find his argument persuasive.[16] One of the primary purposes of our trade secrets statute "is to encourage businesses to invest resources in invention and discovering more efficient methods of production." *Southwestern Energy Co.* v. *Eickenhorst*, 955 F. Sup. 1078, 1084 (W.D. Ark. 1997), aff'd mem., 175 F.3d 1025 (8th Cir. 1999). The statute accomplishes this end by providing that only those persons who have invested their resources in a business may profit from the use

[15] Of course, an employee may have contractual obligations that, during or after the period of his employment, prohibit him from engaging in activities concerning his employer's business for personal gain. That prohibition, however, presents a separate question. See part III of this opinion.

[16] Ruschmeyer relies on *Venango River Corp.* v. *NIPSCO Industries, Inc.*, No. 92 C 2412, 1994 WL 702759, *1, *10 (N.D. Ill. December 15, 1994) (granting motion for summary judgment in favor of defendant that had obtained access to confidential business information during failed negotiations to purchase company of which plaintiff was sole shareholder), and *Omnitech International, Inc.* v. *Clorox Co.*, 11 F.3d 1316, 1322, 1325–26 (5th Cir.) (upholding District Court's granting of directed verdict for defendant that had obtained access to confidential business information during failed negotiations to purchase plaintiff's assets), cert. denied, 513 U.S. 815, 115 S. Ct. 71, 130 L. Ed. 2d 26 (1994), to support his contention. These cases are inapposite, however, because the information alleged to be a trade secret in each of those cases, unlike the information at issue in the present case, had been provided voluntarily to each defendant by the plaintiff, under a nondisclosure agreement, for the specific purpose of allowing each defendant to evaluate its purchase options. See *Omnitech International, Inc.* v. *Clorox Co.*, supra, 1319–21; *Venango River Corp.* v. *NIPSCO Industries, Inc.*, supra, *2.

or disclosure of the resulting inventions and business methods. See *Omnitech International, Inc.* v. *Clorox Co.*, 11 F.3d 1316, 1325 (5th Cir.) (purpose of trade secrets statute "is to prevent one [person] or business from profiting from a trade secret developed by another, because it would thus be acquiring a free competitive advantage" [internal quotation marks omitted]), cert. denied, 513 U.S. 815, 115 S. Ct. 71, 130 L. Ed. 2d 26 (1994); see also *Southwestern Energy Co.* v. *Eickenhorst,* supra, 1084 ("the 'use' prong of the misappropriation definition requires that the use be for competitive reasons in order to give rise to a cause under the [trade secrets statute]"); Restatement (Third), Unfair Competition, Appropriation of Trade Values § 39, p. 425, comment (a) (1995) ("[t]he imposition of liability for the appropriation of a trade secret protects the plaintiff from unfair competition and deprives the defendant of unjust enrichment attributable to bad faith"). In a publicly traded corporation, the persons entitled to profit from their investments in the corporation are its shareholders. An employee who plans to purchase a publicly traded corporation from its shareholders is not *competing* with the shareholders and does not seek to deprive them wrongfully of their right to profit from their investment. Rather, he seeks to offer them a fair return on their investment. In such circumstances, therefore, the employee does not undermine the primary purposes of CUTSA.

We recognize that, as Lydall claims, the purchasing employee may reap the reward of any "hidden value" in the corporation. Contrary to Lydall's contention, however, any such profit will not be had at the expense of the corporation's shareholders because the employee, in a voluntary transaction, will have *purchased* the right to reap that profit rather than have acquired it free of cost.[17] We do not believe that CUTSA was

---

[17] Lydall makes much of the trial court's finding that Ruschmeyer did not intend to engage in a friendly takeover of Lydall's business with the

intended to prohibit this type of activity, which, as Ruschmeyer observes, promotes corporate efficiency and is "a familiar feature of the American business landscape."[18] Accordingly, we conclude that the trial court's finding that Ruschmeyer had used or disclosed the strategic plan as a whole was not supported by the evidence and, therefore, was clearly erroneous.

2

Ruschmeyer also challenges the trial court's finding that he threatened to disclose many, if not all, of the components of the strategic plan to Segal and that he would have done so if Lydall had not discovered the existence of the Hoover plan.[19] In making this finding, the court discredited both Ruschmeyer's testimony, in which he denied that he would have revealed confidential information to Segal without obtaining Lydall's permission, and Curley's testimony that one of the "ground rules" of the Hoover plan was that Ruschmeyer would not disclose any confidential information. Instead, the court relied on Segal's deposition testimony that, before

cooperation of its current officers and directors but, instead, intended a hostile takeover. Even if we assume, arguendo, that this finding is correct, Lydall has not explained why a hostile takeover, as distinct from a friendly takeover, would deprive the shareholders of the value of their investment.

[18] Lydall maintains that this conclusion is inconsistent with the plain and unambiguous language of § 35-51 (b) (2), which, Lydall asserts, prohibits *any* "use," competitive or not, of a trade secret. See General Statutes § 35-51 (b) (2) (defining term "misappropriation" as "disclosure or use of a trade secret"). Lydall's argument, however, overlooks General Statutes § 35-58, which provides that the provisions of CUTSA "shall be applied and construed to effectuate its general purpose to make uniform the law with respect to the subject of this chapter among states enacting it." Thus, pursuant to § 35-58, we are required to apply and construe § 35-51 (b) (2) in order to effectuate its *general purpose*, which, as the case law and § 39 of the Restatement (Third) of the Law of Unfair Competition clearly indicate, is to protect against the *competitive* use of misappropriated trade secrets.

[19] CUTSA authorizes the trial court to enjoin the threatened misappropriation of a trade secret. See General Statutes § 35-52 (a) ("[a]ctual or threatened misappropriation may be enjoined upon application to any court of competent jurisdiction").

pursuing the Hoover plan, he would have wanted to have "product line information including growth prospects, margin—variability of margin among product lines, plans for product line additions or extensions, plans for entering new business lines, [and] any kind of detailed strategic plans outlining either improvements in revenues or expenses."[20] The trial court also relied on Curley's letter to Segal in which Curley stated that he was "eager to have [him] meet [Ruschmeyer] and hear his detailed description of [Lydall] and his strategy to maximize its hidden value." In light of this record, we cannot conclude that the trial court's finding that Ruschmeyer intended to disclose additional components of Lydall's strategic plan to Segal was clearly erroneous.

That does not end our inquiry, however. We also must consider whether the remedy that the trial court ordered for this threatened disclosure, namely, the injunction against all use and disclosure of Lydall's trade secrets, including each individual component of the strategic plan, was proper.

"A party seeking injunctive relief has the burden of alleging and proving irreparable harm and lack of an adequate remedy at law. . . . A prayer for injunctive relief is addressed to the sound discretion of the court and the court's ruling can be reviewed only for the purpose of determining whether the decision was based on an erroneous statement of law or an abuse of discretion." (Citations omitted; internal quotation marks omit-

---

[20] We note that Segal also stated in his deposition testimony that he intended to obtain this information from Lydall's "management team," not from Ruschmeyer. As the trier of fact, however, the court was free to reject this testimony. See, e.g., *Lowe* v. *Shelton*, 83 Conn. App. 750, 765, 851 A.2d 1183 ("[i]t is the trier's exclusive province to weigh the conflicting evidence, determine the credibility of witnesses and determine whether to accept some, all or none of a witness' testimony" [internal quotation marks omitted]), cert. denied, 271 Conn. 915, 859 A.2d 568 (2004).

ted.) *Walton* v. *New Hartford*, 223 Conn. 155, 165, 612 A.2d 1153 (1992).

In support of its finding that Lydall's strategic plan as a whole and each of its individual components constituted trade secrets, the trial court relied exclusively on this court's opinion in *Elm City Cheese Co.* v. *Federico*, supra, 251 Conn. 59. In that case, the named plaintiff, Elm City Cheese Company, Inc. (Elm City), was a privately owned company in the business of producing grated cheese, which it sold to three other commercial cheese producers. See id., 61. The named defendant, Mark Federico, was a high level employee of Elm City who, during the course of his association with Elm City, learned a great deal about all aspects of the business. Id., 62–63. Shortly after resigning from his position with Elm City, Federico opened his own cheese producing business, which duplicated Elm City's production method. Id., 65. Federico's business bought its supplies from Elm City's suppliers and sold its product to Elm City's customers. Id. Elm City brought an action against Federico alleging, inter alia, misappropriation of trade secrets. Id. The trial court found for Elm City on that claim. Id., 66.

On appeal, Federico claimed that the trial court improperly had found that Elm City's cheesemaking process was a trade secret. Id., 70. We determined that the trial court had found that "Elm City's business operations—from the specific sources and costs of its supplies, through the production of its cheese, to the distribution of its product to three specific customers and the prices charged them—[was] a protectable trade secret." Id., 73. We emphasized that we were "*not* saying . . . that each and every component [of Elm City's business plan] necessarily [was] a trade secret in and of itself—although the trial court specifically found that the cheesemaking process [was] a trade secret." (Emphasis in original.) Id. Rather, we were "merely

interpreting the trial court's findings to include such components within the scope of Elm City's trade secret." Id.

Although we concluded in *Elm City Cheese Co.* that the trial court had not actually found that the individual components of Elm City's business method constituted trade secrets, we repeatedly emphasized that CUTSA "clearly provides that virtually every one of the individual components of Elm City's [secret business method], under the appropriate circumstances, could be considered a trade secret in and of itself." Id., 74; see also id., 75 ("each essential component of Elm City's [secret business method] could itself be considered a trade secret under the appropriate circumstances"); id., 78 ("each component of Elm City's business method, under the appropriate circumstances, could be considered a trade secret"); cf. id., 76 n.20 (finding no case in which "a court expressly held that several components of a business, each of which, under the appropriate circumstances, could be deemed a trade secret, could not, taken together, constitute a trade secret"). We noted that there was authority to support Elm City's claim that its list of suppliers, the amounts that it paid for supplies, the manufacturing process and its list of customers could be found to constitute trade secrets. Id., 74–75. We concluded that, because those components could be found to constitute trade secrets, and because of Federico's use of a "unique combination of [those] components"; id., 76; the trial court properly had found that Federico's business method "as a whole—that is, its purchase of returned milk from a very limited number of suppliers, its production from that milk of exclusively hard grated cheese through a unique process, and its sale of its product exclusively to three cheesemakers to blend into their cheeses"; id., 78; was a trade secret. Id. We further concluded that it was implicit in the trial court's findings that each

component of the business plan was a trade secret. Id., 95. Accordingly, we concluded that the trial court properly had enjoined Federico, for a period of three years, from using any information relating to Elm City's business methods. Id., 94–95, 97.

In the present case, Lydall relies on our decision in *Elm City Cheese Co.* to support its contention that there was no need for the trial court to resolve the trade secret status of the individual components of its strategic plan because the plan as a whole was confidential. See id., 95 ("there was no need for the trial court to determine which aspects of the plan [were] protected under [CUTSA], because each component, as part of the trade secret, [was] entitled to protection"). Ruschmeyer claims that *Elm City Cheese Co.* does not support the trial court's conclusion that Lydall's strategic plan as a whole was a trade secret because (1) Lydall failed to demonstrate that *any* elements of the plan were trade secrets, and (2) even if the plan contained confidential elements, those elements did not constitute "enough information to make it virtually impossible for [outsiders] to use the rest of the information constituting its trade secret . . . ." Id., 82.

As we have indicated, our conclusion in *Elm City Cheese Co.* that Elm City's overall business method was a trade secret was premised in large part on our conclusion that many, if not all, of the individual components of the method were trade secrets. There is support, however, for the broader proposition that, even when each of the components of a business plan or method is publicly known, a unique combination of those components can constitute a trade secret. See *Salsbury Laboratories, Inc.* v. *Merieux Laboratories, Inc.*, 735 F. Sup. 1555, 1569 (M.D. Ga. 1989) (business method "can be a trade secret even if all of its component steps are commonly known" [internal quotation marks omitted]), aff'd, 908 F.2d 706 (11th Cir. 1990); see also

*Imperial Chemical Industries Ltd.* v. *National Distill-ers & Chemical Corp.*, 342 F.2d 737, 742 (2d Cir. 1965) ("a trade secret can exist in a combination of character-istics and components, each of which, by itself, is in the public domain, but the unified process, design and operation of which, in unique combination, affords a competitive advantage and is a protectable secret"). It is clear, therefore, that a person who has knowledge of a unique combination of publicly known components constituting a trade secret cannot use or disclose those individual components if doing so would have substan-tially the same effect as using or disclosing the combina-tion itself.

We, however, are aware of no authority for the propo-sition that, when a unique combination of components comprises a trade secret, each individual, publicly known component also *necessarily* is a trade secret, in and of itself. We recognize that, at first blush, certain language in *Elm City Cheese Co.* appears to support this proposition. See *Elm City Cheese Co.* v. *Federico*, supra, 251 Conn. 95 ("there was no need for the trial court to determine which aspects of the plan [were] protected under [CUTSA], because each component, as part of the trade secret, [was] entitled to protection"). As we have noted, however, we emphasized in *Elm City Cheese Co.* that each individual component of Elm City's business plan could have been found to be a trade secret. Id., 74, 75, 78. Moreover, under the specific circumstances of that case, there was no need for the trial court to identify which specific components of the plan were secret because the injunction "state[d] plainly what actions [Federico was] prohibited from taking and, even, certain actions [he was] *not* prohibited from taking"; (emphasis in original) id., 97; thereby providing Federico with adequate guidance for his future conduct.

As we have indicated, the trial court in the present case concluded that, because Lydall's strategic plan as

a whole was a trade secret, each element of the plan was a trade secret.[21] Thus, the trial court's order enjoining Ruschmeyer from all use and disclosure of Lydall's trade secrets encompassed each individual component of the strategic plan, regardless of whether it previously had been disclosed to the public by Lydall and regardless of whether disclosure of the individual components would constitute disclosure of the plan as a whole. We have concluded, however, that disclosure of the publicly known components of a trade secret is prohibited only if their disclosure would amount to disclosure of the trade secret as a whole, and that Ruschmeyer's disclosures did not constitute disclosure of the strategic plan as a whole. We also have concluded that the individual components of Lydall's strategic plan that previously had been disclosed by Lydall to potential investors were not trade secrets, in and of themselves. Because the trial court's injunction encompassed those components, it was overly broad. Moreover, because the trial court misapplied the law, it saw no need to identify the specific components of the strategic plan that were not secret because they had been publicly disclosed, and the injunction is therefore so vague and indefinite as to be unenforceable. Accordingly, we conclude that the injunction is void.[22] See, e.g., *Emhart*

---

[21] In its memorandum of decision, the trial court stated that, for purposes of the injunction, "trade secrets constitute the strategic plan as a whole . . . and those parts of the plan not yet disclosed to the public." After this appeal was filed, the Appellate Court granted Ruschmeyer's motion to articulate those parts of the plan disclosed to the public and, therefore, not subject to the injunction. The trial court issued an articulation in which it stated that "[t]rade secrets constitute the strategic plan as a whole, as well as all individual parts of the plan, and notwithstanding any public disclosure of any individual or limited parts of the strategic plan, [Ruschmeyer] is also permanently enjoined from the use and disclosure of all individual parts of the strategic plan in order to protect the plan as a whole."

[22] Of course, our conclusion that the injunction is void does not mean that Ruschmeyer is not bound by the confidentiality provisions of his employment agreements with Lydall or that he has no potential liability under CUTSA if he reveals trade secrets. It means only that Ruschmeyer is in the same position that he was in before the trial court issued the injunction and must

*Industries, Inc.* v. *Amalgamated Local Union 376, U.A.W.*, 190 Conn. 371, 409, 461 A.2d 422 (1983) (injunction is void when it is "so vague that [persons] of common intelligence must necessarily guess at its meaning and differ as to its application" [internal quotation marks omitted]).

### III

We next address Ruschmeyer's claim that the trial court improperly found that he had violated his employment agreements with Lydall. The court found that each of the items of information that it had found to constitute a trade secret also constituted "confidential information" under the first employment agreement. Because it found that Ruschmeyer had used or disclosed the trade secrets, it also found that Ruschmeyer had breached the confidentiality provision of the first employment agreement. In addition, the court found that, by formulating the Hoover plan while still employed by Lydall, Ruschmeyer had violated the provision of the second employment agreement requiring him to "devote his full business time and attention and best efforts to the affairs of [Lydall] . . . ." Finally, for essentially the same reasons that the court enjoined Ruschmeyer from disclosing Lydall's trade secrets, the court also enjoined Ruschmeyer from disclosing that same confidential information in accordance with the first employment agreement.

"Whether a contract has been breached ordinarily is a question of fact, subject to the clearly erroneous standard of review." *De La Concha of Hartford, Inc.* v. *Aetna Life Ins. Co.*, 269 Conn. 424, 431 n.5, 849 A.2d 382 (2004). Accordingly, our review of Ruschmeyer's claim is limited to a determination of whether the evidence reasonably supports the trial court's finding that

use his good faith judgment in determining what information about Lydall's business he may disclose.

Ruschmeyer had breached his employment agreements with Lydall.

Ruschmeyer contends that, for the same reasons that the trial court incorrectly determined that he had used or disclosed trade secrets in violation of CUTSA, the court incorrectly determined that he had violated the confidentiality provision of the first employment agreement. We have concluded, however, that Ruschmeyer unlawfully disclosed trade secret information pertaining to Lydall's plan to use its OEM products to generate capital. Accordingly, the trial court's determination that this unlawful disclosure constituted a breach of the confidentiality provisions of the first employment agreement was not clearly erroneous.

We further conclude that the record supports the trial court's finding that Ruschmeyer's conduct while still employed by Lydall violated the "best efforts" provision of the second employment agreement. Although Ruschmeyer's efforts to develop a plan to purchase Lydall did not violate CUTSA, those efforts were not undertaken on behalf of Lydall or its shareholders. During the period of his employment, Ruschmeyer was not free under the employment agreement to pursue his own undisclosed vision for Lydall's future in disregard of the directives of his fellow corporate officers and the board of directors. Moreover, the evidence established that Ruschmeyer had disparaged Lydall in the presence of other employees, had disclosed to Tremblay statements made about her in confidence by members of the board of directors, had spent a large percentage of his time in his office with the door closed after his performance evaluation in January, 2003, at which time it reasonably may be inferred that he was formulating the Hoover plan, and had used his office computer to send e-mails detailing the Hoover plan. Therefore, the trial court's finding that the defendant had violated the employment agreements was not clearly erroneous.

Nevertheless, for the reasons set forth in part II B 2 of this opinion, we conclude that the injunction issued by the trial court in connection with the breach of contract count is void because it provides insufficient guidance with respect to the particular conduct that it purports to prohibit.[23] With respect to the defendant's claim that the trial court's award of damages under the breach of contract claim was improper, we address that claim in part VI of this opinion.

## IV

Ruschmeyer next claims that the trial court improperly awarded Lydall punitive damages and attorney's fees pursuant to § 35-53 (b). In particular, Ruschmeyer contends that the finding on which the trial court based its award of punitive damages and attorney's fees under § 35-53 (b), namely, that Ruschmeyer wilfully and maliciously had violated CUTSA, is not supported by the evidence. We agree.

In support of its finding of a wilful and malicious misappropriation of Lydall's trade secrets, the trial court relied on its predicate findings that Ruschmeyer had (1) initiated the Hoover plan and secretly planned a hostile takeover of Lydall while he still was employed by Lydall, a course of conduct that, according to the trial court, was unethical as well as a violation of the second employment agreement,[24] (2) lied to Skomorowski about the March 20, 2003 meeting with Arnold and Rosenzweig, and (3) been angry at Lydall because of his unfavorable performance review by Widmann. Ruschmeyer claims that the trial court's finding of wilful and malicious misappropriation was improper because

---

[23] We therefore do not reach Ruschmeyer's contention that the trial court improperly issued an injunction on the basis of Lydall's breach of contract claim on the ground that Lydall had not established irreparable harm.

[24] It is well settled that punitive damages generally are not recoverable for breach of contract. E.g., *Triangle Sheet Metal Works, Inc.* v. *Silver,* 154 Conn. 116, 127, 222 A.2d 220 (1966).

he did not misappropriate any trade secrets. Ruschmeyer further contends that, even if he did violate CUTSA, his subjective feelings toward his fellow corporate officers and members of the board of directors were insufficient, as a matter of law, to support a finding that he wilfully and maliciously had misappropriated trade secrets.

"[T]he trial court has broad discretion in determining whether damages are appropriate. . . . Its decision will not be disturbed on appeal absent a clear abuse of discretion." (Citation omitted; internal quotation marks omitted.) *Elm City Cheese Co.* v. *Federico*, supra, 251 Conn. 90. "The flavor of the basic requirement to justify an award of punitive or exemplary damages has been repeatedly described in terms of wanton and malicious injury, evil motive and violence. . . . [P]unitive damages may be awarded only for outrageous conduct, that is, for acts done with a bad motive or with a reckless indifference to the interests of others." (Citations omitted; internal quotation marks omitted.) *Triangle Sheet Metal Works, Inc.* v. *Silver*, 154 Conn. 116, 128, 222 A.2d 220 (1966).

In *Elm City Cheese Co.*, we upheld a punitive damages award under § 35-53 (b) on the basis of evidence demonstrating that Federico was set "on a course for Elm City's demise rather than to enter into fair competition [with Elm City]." (Internal quotation marks omitted.) *Elm City Cheese Co.* v. *Federico*, supra, 251 Conn. 92. We also noted that there was evidence of animosity between the principal of Elm City and Federico before the latter's misappropriation of the trade secret. See id., 93.

For purposes of Ruschmeyer's claim of impropriety, the controlling distinction between *Elm City Cheese Co.* and the present case is that, in the former, the evidence revealed that Federico had misappropriated

a trade secret with the intent to injure *the owner of the trade secret*. Although we have concluded in the present case that Ruschmeyer disclosed a trade secret, we also have concluded that his general course of conduct in planning to purchase Lydall did not violate CUTSA and could not injure the shareholders who owned Lydall and its trade secrets. It is clear, therefore, that Ruschmeyer could not have violated CUTSA *maliciously* merely by planning to purchase Lydall, regardless of whether he harbored animus toward his fellow corporate officers and members of the board of directors or intended to injure them. We therefore conclude that the trial court incorrectly determined that Lydall was entitled to punitive damages and attorney's fees under § 35-53 (b).

V

We next address Ruschmeyer's claim that the trial court incorrectly concluded that he had violated CUTPA and, further, that Lydall was entitled to punitive damages under § 42-110g (a). We agree with Ruschmeyer.

"To the extent that [an appellant] is challenging the trial court's interpretation of CUTPA, our review is plenary. . . . [W]e review the trial court's factual findings under a clearly erroneous standard. . . . Appellate courts do not examine the record to determine whether the trier of fact could have reached a different conclusion. Instead, we examine the trial court's conclusion in order to determine whether it was legally correct and factually supported." (Internal quotation marks omitted.) *Updike, Kelly & Spellacy, P.C.* v. *Beckett*, 269 Conn. 613, 656, 850 A.2d 145 (2004).

The trial court concluded that "Ruschmeyer engaged in unfair and deceptive acts or practices in his conduct in attempting a takeover of Lydall" and that "his violations of [CUTSA were] sufficient to conclude that he has offended public policy." Thus, the essential predicates of the trial court's determination that Ruschmeyer

violated CUTPA were its determinations that Rusch-
meyer's conduct in attempting to take over Lydall was
unethical and improper and that he illegally had dis-
closed numerous trade secrets, including Lydall's stra-
tegic plan. Ruschmeyer claims that, because the trial
court's finding of a CUTPA violation was entirely deriva-
tive of its finding of a violation of CUTSA, and because
he did not violate CUTSA, the court's finding of a
CUTPA violation was improper.

As we previously have explained, Ruschmeyer's
attempted takeover of Lydall's business did not consti-
tute a violation of CUTSA, and the evidence does not
support a finding that he had disclosed multiple trade
secrets or Lydall's overall strategic plan. We also have
concluded that, as a general matter, the attempted take-
over of a publicly traded corporation by a former
employee promotes corporate efficiency and does not
offend the public policy underlying CUTSA. We recog-
nize that Ruschmeyer violated CUTSA by disclosing
Lydall's plans for its OEM products. Lydall does not
claim, however, and we are unable to conclude, that
this single violation, in and of itself, and without any
evidence of harm to Lydall, rises to the level of a CUTPA
violation. The trial court, therefore, properly could not
rely on its findings that Ruschmeyer's attempted take-
over was unethical and that he had violated CUTSA to
support its determination of a CUTPA violation.

We also have concluded that the trial court reason-
ably found that Ruschmeyer had violated his second
employment agreement with Lydall by failing to "devote
his full business time and attention and best efforts to
the affairs of [Lydall]" during the period of his employ-
ment. The trial court did not conclude, however, and
Lydall does not claim, that this breach of the employ-
ment agreement would be sufficient to establish a
CUTPA violation in the absence of a showing that the
attempted takeover, in and of itself, was unlawful. See

*Lawrence* v. *Richman Group Capital Corp.*, 358 F. Sup. 2d 29, 42 (D. Conn. 2005) (absent substantial aggravating circumstances, simple breach of contract is insufficient to establish claim under CUTPA). Accordingly, the trial court incorrectly determined that Ruschmeyer had violated CUTPA. Therefore, Lydall was not entitled to punitive damages under § 42-110g (a).

## VI

Ruschmeyer also claims that the trial court improperly awarded compensatory damages to Lydall.[25] Ruschmeyer contends that the trial court improperly conducted a posttrial damages hearing even though it had not bifurcated the liability and damages phases of the trial and that Lydall had presented no evidence of damages at trial. Ruschmeyer further maintains that, even if the trial court properly held the hearing, the evidence adduced at the hearing was insufficient to support the portions of the award representing (1) the forfeiture of his salary from March 20, 2003, through April 16, 2003, (2) payments to the special litigation committee of Lydall's board of directors, and (3) the portion of Skomorowski's salary for the days that he attended trial.[26] Ruschmeyer finally asserts that the

---

[25] We concluded in parts IV and V of this opinion that Lydall was not entitled to punitive damages or attorney's fees because Ruschmeyer did not wilfully and maliciously violate CUTSA and did not violate CUTPA. Accordingly, we need not address those portions of the damages award in connection with Ruschmeyer's claims that the trial court improperly held a posttrial damages hearing and that the evidence did not support the award rendered by the court.

[26] Ruschmeyer also claims that the trial court's finding that he had breached his employment agreements with Lydall did not support the award of compensatory damages and that there was no claim that he had breached a fiduciary duty to Lydall. See footnote 27 of this opinion; cf. *Breen* v. *Larson College,* 137 Conn. 152, 157, 75 A.2d 39 (1950) ("[i]t has long been the law of this state that in contracts of hiring there is an implied condition that the servant will perform the duties incident to his employment honestly, and will do nothing injurious to his employer's interest, and if he proves radically unfaithful to his trust or is guilty of gross misconduct he forfeits all right to compensation" [internal quotation marks omitted]). We need not

award for Skomorowski's salary was improper as a matter of law. We conclude that the trial court improperly allowed Lydall to prove its damages at a posttrial hearing in damages. We also conclude, however, that Lydall was entitled to nominal damages. In light of these conclusions, we need not address Ruschmeyer's other claims.

The following facts and procedural history are relevant to this claim. At trial, Skomorowski was asked on cross-examination whether he could identify any pecuniary damages that Lydall had suffered as a result of Ruschmeyer's conduct. Skomorowski responded: "At this point in time, no." In its posttrial brief, Lydall stated that "[l]argely because the misdirected Curley letter allowed Lydall to file suit immediately, little pecuniary harm has been caused [to] Lydall by Ruschmeyer's use of Lydall's trade secrets." Lydall asserted, however, that, because Ruschmeyer had breached his contract with and fiduciary duty to Lydall, he should forfeit his salary for that period of time when he was formulating the Hoover plan. In his posttrial reply brief, Ruschmeyer asserted that Lydall was not entitled to damages because Lydall had neither pleaded nor proved breach of fiduciary duty, and, indeed, it had conceded at trial that it had suffered no damages.[27] Ruschmeyer also

decide whether a simple breach of contract would entitle Lydall to recoup the salary that it had paid to Ruschmeyer or whether Ruschmeyer breached a fiduciary duty to Lydall in view of our conclusion that Lydall failed to claim or prove any damages at trial.

[27] As we have indicated, Lydall's complaint was comprised of three counts, namely, breach of contract, violation of CUTSA, and violation of CUTPA. Lydall contends, however, that it also alleged breach of fiduciary duty because, first, the introductory portion of the complaint contained a recitation of the facts that included the statement that Ruschmeyer had violated "his duty of loyalty as an officer of Lydall," and, second, the breach of contract count contained the allegation that Ruschmeyer should be enjoined from disclosing further information "in breach of his fiduciary duties owed to Lydall . . . ." The trial court did not expressly find that Ruschmeyer had breached any fiduciary duty to Lydall.

requested a hearing at which he could present evidence in support of his claim for attorney's fees.[28] In its post-trial reply brief, Lydall requested a posttrial damages hearing. The trial court granted that request.

At the damages hearing, Ruschmeyer claimed that Lydall should not be allowed to present evidence of compensatory damages because it had waived any claim for damages by failing to present evidence at trial that would support a finding of damages. Lydall responded that it was not introducing any new evidence in support of its compensatory damages claim but was relying entirely on evidence adduced at trial. Specifically, in support of its claims for damages for the cost of Skomorowski's salary during the thirteen days that he attended trial and one day of deposition testimony,[29] and for reimbursement of Ruschmeyer's salary for the twenty-seven days between March 20, 2003, and his termination on April 16, 2003, Lydall relied on a proxy statement prepared for its stockholders that listed Skomorowski's salary in 2002 as $400,000 and Ruschmeyer's salary in 2002 as $375,000. In support of its claim for damages for payments to the members of the special litigation committee, Lydall relied on testimony that each of the four members of the committee had been paid $1000 for each meeting and that the committee "met as needed . . . ." Lydall sought compensation for only one meeting. The trial court awarded damages of $15,342.46 for Skomorowski's salary, $27,739.80 for Ruschmeyer's salary and $4000 for the special litigation committee meeting, for a total award of $47,082.[30]

---

[28] The record reveals that, during trial, Ruschmeyer requested a posttrial hearing on his claim for attorney's fees. The amount of attorney's fees could not be determined at the time of trial because the parties anticipated significant posttrial fees in connection with the preparation of posttrial briefs.

[29] Lydall maintained that the trial court could take judicial notice of the time that Skomorowski had spent in the courtroom during trial.

[30] In determining the total award of compensatory damages, the trial court rounded down the award to the nearest whole dollar figure.

On appeal, Ruschmeyer relies on *Expressway Associates II* v. *Friendly Ice Cream Corp. of Connecticut,* 218 Conn. 474, 590 A.2d 431 (1991), to support his claim that Lydall waived any claim for compensatory damages by failing to assert such a claim at trial and, therefore, that the trial court improperly held a posttrial hearing on those damages. In that case, the plaintiff, Expressway Associates II (Expressway), claimed that the defendant, Friendly Ice Cream Corporation of Connecticut (Friendly), had interfered with its use of a right-of-way over Friendly's land. Id., 475. The trial court determined that Expressway had failed to establish that it had been irreparably harmed by Friendly's conduct and, accordingly, denied injunctive relief. Id. The court also concluded that Expressway had failed to prove damages. Id.

Expressway appealed to the Appellate Court, which determined, contrary to the trial court's holding, that Expressway was entitled to injunctive relief. Id., 476. The Appellate Court remanded the case to the trial court with direction to render judgment granting injunctive relief and for further proceedings to determine the amount of damages. Id. We granted Friendly's petition for certification to appeal limited to the issue of whether the Appellate Court properly had ordered further proceedings on damages even though Expressway had failed to prove damages at trial and had conceded that it was entitled only to nominal damages. Id.

We began our analysis in *Expressway Associates II* by observing that there was nothing in the record to suggest that the issues of liability and damages were to be tried separately or that Expressway otherwise had been prevented or constrained from adducing proof of damages at the time the case had proceeded to trial as scheduled. Id., 477–78. Moreover, Expressway's counsel had conceded during closing argument that any damages were "speculative." (Internal quotation marks omitted.) Id., 478. We concluded, therefore, that

Expressway had, in effect, sought an injunction as its sole remedy, and that it was not entitled to a separate trial on the issue of damages. Id. We also concluded, however, that, because Expressway had proved that Friendly had interfered with the use of the right-of-way, Expressway was entitled to nominal damages. Id., 479.

Lydall contends that *Expressway Associates II* is distinguishable from the present case because, in that case, Expressway failed to adduce *any* evidence of damages at trial. In contrast, Lydall maintains, the trial court in the present case relied on evidence presented at trial in support of the damages award. Lydall does not claim, however, that the evidence that the court relied on was introduced at trial *for that purpose*,[31] or that it had made any claim or argument *during trial* that the evidence should be used to support the compensatory damages ultimately awarded by the court.[32] We cannot perceive why, if Lydall properly was limited to the evidence presented at trial for purposes of the posttrial hearing in damages—a proposition that Lydall apparently does not dispute—Lydall was allowed to use that evidence for an entirely different purpose than the purpose for which it was admitted. Lydall's use of this evidence in this way limited Ruschmeyer's ability to challenge Lydall's new damages claims with rebuttal evidence, cross-examination or impeachment, thereby subjecting him to the same, if not greater, unfair surprise and prejudice to which allowing the introduction of new evidence would have subjected him.

---

[31] For example, the proxy statement that the trial court relied on in support of its damages award for portions of Skomorowski's and Ruschmeyer's salaries had been introduced by *Ruschmeyer* to support his contention that certain information that he had disclosed was public.

[32] We note, for example, that, if Lydall had intended at the time of trial to claim portions of the salaries paid to Skomorowski and Ruschmeyer in 2003 as damages, it easily could have introduced evidence of their 2003 salaries at trial. No such evidence was presented.

Indeed, Lydall has provided no authority to support its claim that a trial court has the inherent power under *any* circumstances to order a separate hearing in damages after the conclusion of evidence in a trial that has not been bifurcated. It is undisputed that, before trial, the court properly could have bifurcated the liability and damages phases of the trial and allowed the introduction of new evidence and new arguments in the damages phase. See *Reichhold Chemicals, Inc.* v. *Hartford Accident & Indemnity Co.*, 243 Conn. 401, 423, 703 A.2d 1132 (1997) (bifurcation is within broad discretion of trial court and "may be appropriate in cases in which litigation of one issue may obviate the need to litigate another issue"). When neither party has reason to believe that the trial has been bifurcated, however, the only function of a posttrial damages hearing would be to allow the party claiming damages a second bite at the apple. Lydall has pointed to no evidence in the present case that there was any indication before the conclusion of the trial that the trial court would order a separate hearing on compensatory damages.

To be sure, the trial court stated at the damages hearing that it "was under the impression, and I can't point to . . . a section of the transcript, but I was under the impression . . . that we would take up the attorney's fees and the damages at a subsequent date because of the fact that the main issue seemed to be whether or not an injunction should issue, at that point." Even though the trial court was under that impression, however, in the absence of any request for bifurcation or any indication by the court during trial that the issues would be bifurcated, neither party reasonably could have anticipated that there would be a separate damages hearing. Moreover, Lydall's apparent belief that it could not present additional evidence on damages after the conclusion of trial belies any claim that it believed that the issues had been bifurcated. Indeed, we are not

aware of any precedent for holding a hearing in damages at which the presentation of evidence on damages is prohibited.

Accordingly, we conclude that the present case is governed by our decision in *Expressway Associates II*. As in that case, the primary focus of the trial in the present case was on Lydall's claim for injunctive relief. Lydall presented no evidence and made no arguments in support of its claim for damages at trial but, rather, conceded that it could point to no pecuniary damages.[33] Furthermore, the trial court gave no indication that the issue of damages would be tried thereafter in a separate proceeding. Accordingly, we conclude that the trial court improperly granted Lydall's request for a posttrial hearing in damages. As in *Expressway Associates II* v. *Friendly Ice Cream Corp. of Connecticut*, supra, 218 Conn. 479, however, we also conclude that Lydall is entitled to nominal damages of $1 under its breach of contract claim. See *News America Marketing In-Store, Inc.* v. *Marquis*, 86 Conn. App. 527, 535, 862 A.2d 837 (2004) ("[i]f a party has suffered no demonstrable harm . . . that party may be entitled . . . to nominal damages for breach of contract"), aff'd, 276 Conn. 310, 885 A.2d 758 (2005).

## VII

Finally, we address Ruschmeyer's contention that the trial court improperly enjoined him from bringing an

---

[33] Lydall asserts that Skomorowski did not concede that Lydall had suffered no damages but testified only that he *personally* was not aware of any damages *at that time*. Lydall further notes that the trial court took that view of Skomorowski's testimony. We are not persuaded. Because there was no other evidence or argument by Lydall concerning damages and no indication that the issue of damages was to be tried separately, Ruschmeyer was entitled to rely on the unequivocal testimony of Skomorowski, Lydall's chief executive officer, that he was not aware of any pecuniary losses that Lydall had sustained as the result of Ruschmeyer's conduct up to the time of trial, in concluding that Lydall was not seeking compensatory damages.

action for indemnification in the state of Delaware. We agree with Ruschmeyer's claim.

The following additional facts and procedural history are relevant to this claim. The second employment agreement contained an indemnification provision pursuant to which Lydall agreed to indemnify Ruschmeyer for costs and expenses incurred by him as a result of litigation arising from his employment with Lydall. The indemnification provision entitled Ruschmeyer to bring an action for indemnification in "an appropriate court of the [s]tate of Delaware, or in any other court of competent jurisdiction . . . ." Ruschmeyer sought and obtained from Lydall an advance payment of his legal fees pursuant to the indemnification provision, on the condition that Ruschmeyer would reimburse Lydall for the advance payment if Lydall prevailed in this action. After trial, Lydall filed a motion for, inter alia, further injunctive relief in which it requested that the trial court order Ruschmeyer to return the advance payment and enjoin him from seeking indemnification for additional legal fees in a Delaware court.

The trial court held a hearing on the indemnification issue on January 10, 2005. At the hearing, Lydall maintained that the injunction was necessary to protect its award of attorney's fees. Ruschmeyer asserted that an injunction would be improper because (1) the only issue in dispute was damages, (2) the indemnification claim was never pleaded or litigated at trial, and (3) under the indemnification agreement, Ruschmeyer was entitled to indemnification until the completion of all appeals. The trial court granted Lydall's request for an injunction on the ground that it was necessary to prevent a multiplicity of actions. The court recognized, however, that the issue had not been adequately litigated and indicated that it would allow Lydall to amend its complaint to include a claim for a judgment declaring that Ruschmeyer was not entitled to indemnification. The court

also stated that it would allow Ruschmeyer to bring a counterclaim seeking a declaratory judgment on the same issue. At the conclusion of the hearing, the parties stipulated that, pending resolution of all appeals, Lydall would not seek reimbursement of the advance and Ruschmeyer would not seek further advances. Ruschmeyer also agreed to return the advance payment already received if Lydall ultimately prevailed on appeal.

Ruschmeyer contends that the trial court improperly enjoined him from bringing an indemnification action in Delaware because the issue had not been pleaded or litigated in the present action. Lydall contends that, under *Monroe* v. *Middlebury Conservation Commission*, 187 Conn. 476, 447 A.2d 1 (1982), an injunction is the proper remedy in the circumstances "to avoid multiplicity of actions at law . . . and to provide effective, convenient, direct, and complete relief." (Citations omitted.) Id., 482. We reject Lydall's claim that the principle articulated in *Monroe* supports its claim.

In *Monroe*, the named plaintiff, Jesse Monroe, had submitted an application to the named defendant, the conservation commission of the town of Middlebury (conservation commission), for the review of a proposal to install two recharge basins on Monroe's property. Id., 477. The defendant William P. Longo, the first selectman of the town of Middlebury, had notified the conservation commission that he believed that Monroe would have to submit applications to the defendant Pomperaug water authority (water authority) and to the planning and zoning commission of the town of Middlebury (zoning commission). Id., 478. The water authority also advised Monroe that he would have to take "the steps mandated by the charter of the water authority" before submitting an application either to the conservation commission or to the zoning commission. Id., 479. Monroe then brought an action seeking an injunction to

compel the conservation commission to conduct a public hearing on his application, to compel the zoning commission to conduct a public hearing on his application for an earth removal permit, to restrain the water authority from interfering with his right to a public hearing before the conservation commission and to restrain Longo from interfering with his right to a public hearing before both commissions. Id., 479. The trial court granted Monroe's request for an injunction. Id.

On appeal to this court, the defendants argued that the trial court should not have issued an injunction because of the availability of an adequate remedy at law, namely, a writ of mandamus. Id., 480. We concluded that a writ of mandamus would not have been adequate to address Monroe's concerns because, in the absence of any order enjoining the water authority from interfering with the proceedings before the commissions, "[a]ny action taken by the commissions would leave [Monroe's] application under a cloud. Resort to equity is appropriate both to avoid multiplicity of actions at law . . . and to provide effective, convenient, direct, and complete relief." (Citations omitted.) Id., 481–82; see also *Dimmock* v. *New London*, 157 Conn. 9, 19–20, 245 A.2d 569 (1968) (directing trial court to issue injunction requiring defendant city to compensate adequately plaintiffs for permanent taking of water rights, or, alternatively, precluding city from further diversion of stream waters, in order to avoid multiplicity of future actions for compensation); *Hammerberg* v. *Leinert*, 132 Conn. 596, 602–605, 46 A.2d 420 (1946) (trial court abused discretion in denying injunction requiring defendant to pay individual milk producers amounts owed under statute because prevention of multiple actions at law by milk producers was proper ground for injunction).

The facts of *Monroe, Dimmock* and *Hammerberg* are materially different from the facts of the present case.

In each of those cases, the granting of an injunction prevented a multiplicity of actions by *providing the relief* that otherwise would have to be sought in additional actions. In the present case, the trial court properly recognized that it could *not* grant the ultimate relief that Lydall sought, namely, a judgment declaring that Ruschmeyer was not entitled to indemnification, because that issue had not been litigated yet. The injunction that the trial court issued merely provided that that issue could not be litigated in a Delaware court because the Connecticut trial court had jurisdiction over the underlying claims. Thus, as a practical matter, the injunction did not avoid a multiplicity of lawsuits[34] because the indemnity action would have to be litigated in some venue if Ruschmeyer were to prevail on appeal. Instead, the injunction prevented Ruschmeyer from exercising his right under the indemnification provisions of the employment agreement to choose the forum for the litigation.

We acknowledge that the resolution of the issues in the present case would be relevant in an indemnification action and that the possibility of inconsistent judgments would exist if the trier of fact in the indemnification action did not give due weight to the judgment in this case.[35] Nevertheless, we cannot conclude that the resolution of the present case necessarily *controls* the outcome of the indemnification action,

[34] We recognize that the trial court indicated that it would allow Lydall to amend its complaint to include an action for a declaratory judgment and that, in a technical sense, the injunction against bringing an action in Delaware would prevent a second action. Nevertheless, if the issue is to be tried, an additional evidentiary hearing must be held in some court, whether in Connecticut or Delaware.

[35] Accordingly, it would be reasonable for the court in which the indemnification action is brought to stay proceedings pending final resolution of this action. The trial court did not temporarily enjoin Ruschmeyer from bringing an indemnification action pending resolution of this appeal, however. Rather, it permanently enjoined him from bringing an indemnification action in Delaware.

such that the party prevailing in this action automatically will prevail in the indemnification action. Indeed, it is not unreasonable to suppose that the parties may disagree about who prevailed in this appeal. Who prevailed and the effect of that determination on the defendant's right to indemnification are the very issues that must be resolved in the indemnification action. Nor will we presume that the Delaware courts will not give due consideration to the judgment of a Connecticut court. Under these circumstances, we cannot perceive of any equitable basis for preventing Ruschmeyer from invoking his right under the indemnification provisions of the employment agreement to choose the forum for the resolution of these issues.[36] Cf. *Metropolitan Life Ins. Co.* v. *Fuller*, 61 Conn. 252, 258, 23 A. 193 (1891) ("we ought not in this jurisdiction to enjoin defendants . . . from bringing cases in [another state], which, for aught that appears, would be there legal, and might be prosecuted to a successful issue"). Accordingly, we conclude that the trial court abused its discretion in enjoining Ruschmeyer from bringing an indemnification action in Delaware.

The judgment is reversed as to the CUTPA count and as to the award of compensatory damages, punitive

---

[36] Lydall cites *AvalonBay Communities, Inc.* v. *Plan & Zoning Commission*, 260 Conn. 232, 246, 796 A.2d 1164 (2002), for the proposition that a trial court has the inherent power to exercise continuing jurisdiction over a case in order to vindicate its judgments. This argument presumes, however, that a judgment that Ruschmeyer is entitled to indemnification would be inconsistent with a result in the present case that may be deemed favorable to Lydall. As we have indicated, that is not necessarily the case but is one of the issues to be determined in the indemnification action.

Lydall also cites *Corbin* v. *Corbin*, 26 Conn. Sup. 443, 226 A.2d 799 (1967), in support of the trial court's injunction. That case merely held, however, that when a party is seeking relief in one court, that court properly may enjoin the party from seeking the same relief in the courts of another jurisdiction. See id., 448 (plaintiff properly was enjoined from bringing second action when "the plaintiff is seeking affirmative relief from courts of two states simultaneously"). As we have indicated, Ruschmeyer has not sought indemnification from Lydall in the Connecticut courts.

damages, attorney's fees and the injunctive relief precluding Ruschmeyer from disclosing Lydall's trade secrets and from bringing an indemnification action in the state of Delaware, and the case is remanded with direction to render judgment for Ruschmeyer on the CUTPA count and to award nominal damages in the amount of $1 to Lydall on the breach of contract count; the judgment is affirmed in all other respects.

In this opinion the other justices concurred.